Rhett O. Millsaps II (SBN 348949)
rhett@lex-lumina.com
Mark A. Lemley (SBN 155830)
mlemley@lex-lumina.com
LEX LUMINA PLLC
700 S. Flower Street, Suite 1000
Los Angeles, CA  90017
United States
Telephone:  +1 213.600.6063
Facsimile:  +1 646.906.8657

*Attorneys for Plaintiff Google LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| GOOGLE LLC, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| NGUYEN VAN DUC, PHAM VAN THIEN, and DOES 1-20, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Google LLC ("Google"), by and through its attorneys, Lex Lumina PLLC, for its Complaint, hereby alleges against Defendants Nguyen Van Duc, Pham Van Thien, and Does 1-20 (collectively, "Defendants") as follows:

### NATURE OF THE ACTION

1.      Google brings this action to stop Defendants' systematic abuse of Google accounts to submit a barrage of fraudulent copyright takedown requests aimed at removing hundreds of thousands of their competitors' website URLs from Google Search results. Defendants have weaponized copyright law's notice-and-takedown process and used it not for its intended purpose of expeditiously removing infringing content, but instead to have the legitimate content of their competitors removed based on false

allegations. Defendants' illegal, fraudulent scheme harms consumers, third-party businesses, and Google; stifles competition; and threatens to tarnish Google's trusted brand.

2.     Over the last few years and continuing to the present, Defendants—led by two individuals, Defendants Nguyen and Pham—have created at least 65 Google accounts so they could submit thousands of fraudulent notices of copyright infringement against more than 117,000 third-party website URLs.[1] Defendants appear to be connected with websites selling printed t-shirts, and their unlawful conduct aims to remove competing third-party sellers from Google Search results. Defendants have maliciously and illegally exploited Google's policies and procedures under the DMCA to sabotage and harm their competitors.

3.     Defendants' scheme—which is expressly prohibited by Google's Terms of Service and is illegal under both federal and California law—has caused significant damage to Google and its customers. Google and its third-party advertising customers have lost substantial revenue as a direct result of Defendants' misconduct, which additionally has forced Google to expend extensive resources for investigation and remediation.

4.     Google brings this lawsuit for injunctive relief and damages to put an end to Defendants' abusive, fraudulent conduct and to hold them accountable for their illegal actions.

## THE PARTIES

5.     Plaintiff Google LLC is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043.

6.     On information and belief, Defendant Nguyen Van Duc is an individual residing in Vietnam.

7.     On information and belief, Defendant Pham Van Thien is an individual residing in Vietnam.

---

[1] In addition to the fraudulent copyright notices targeting more than 117,000 URLs identified so far by Google, Defendants submitted thousands more notices of alleged copyright infringement targeting more than half a million URLs. Google has reason to suspect that those notices will prove to be fraudulent as well.

8.      Google does not know the true names and capacities of those Defendants sued as Does 1-20 ("Doe Defendants") and therefore sues them under fictitious names. On information and belief, some or all of the Doe Defendants are individuals or entities working at the direction of and/or in active concert with Defendants Nguyen and Pham to prepare and submit thousands of fraudulent takedown requests to Google. Google will amend this complaint to allege the true names and capacities of these Doe Defendants if and when they are ascertained.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over Google's claim under Title II of the Digital Millennium Copyright Act (DMCA), 17 U.S.C. § 512 (Count I), under 28 U.S.C. §§ 1331 and 1338(a). The Court has subject matter jurisdiction over Google's claims for breach of contract and intentional interference with contractual relations (Counts II-III) under 28 U.S.C. §§ 1332 and 1367.

10.      The Court has personal jurisdiction over Defendants, and venue is proper here, because Defendants have the minimum contacts required to warrant this Court's exercise of jurisdiction. Specifically, Defendants committed tortious acts directed to the State of California and this District, and Google's claims arise from those activities. Defendants affirmatively sought and used the services of Google, a limited liability company with its principal place of business in this District, and Defendants committed or facilitated the commission of tortious acts in this District and have wrongfully caused Google injury in this District. Additionally, Defendants consented to jurisdiction and venue in this District by agreeing to Google's Terms of Service ("TOS"),[2] as discussed below.  Google's TOS provides that "all disputes arising out of or relating to these terms . . . will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and [the user] and Google consent to personal jurisdiction in those courts."

## DIVISIONAL ASSIGNMENT

11.      While this action arises in part under the DMCA, Google's claims do not involve assertion of intellectual property rights. This action thus is properly assigned to the San Jose Division of this District under Civil Local Rules 3-2(c) and 3-2(e) because Google is headquartered in Santa Clara

---

[2] Google's TOS is published at https://policies.google.com/terms.

County, which is the county where a substantial part of the events giving rise to Google's claims occurred, where a substantial part of the property that is the subject of the action is situated, and where venue is designated in Google's TOS breached by Defendants.

## FACTUAL BACKGROUND

### The DMCA's Notice-and-Takedown Procedures Under 17 U.S.C. § 512

12.   Congress passed the DMCA in 1998 "to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and education in the digital age." S. Rep. No. 105-190, at 1-2. Given the nature and vastness of the Internet, online service providers like Google usually lack information—*e.g.*, whether licenses exist between their users and claimed rightsholders—to make determinations about whether material posted online by a user infringes others' lawfully held copyrights. Congress passed the DMCA with the aim of striking a careful balance between fostering the growth and development of Internet service providers, on the one hand, and protecting the rights of copyright owners against online infringement on the other. Toward this end, the DMCA provides a safe harbor from copyright infringement claims for service providers that meet certain conditions.

13.   Specifically, Title II of the DMCA, 17 U.S.C. § 512(c), provides a "notice-and-takedown" mechanism that gives copyright owners and online service providers procedural consistency and legal certainty in how copyright infringement claims based on user content are handled. This mechanism relies on copyright claimants to provide particularized details about their claims of infringement, including (i) an assurance under penalty of perjury that the complaining party is authorized to act on behalf of the owner of an exclusive right and (ii) a statement that the claimant has a good faith belief that the complained-of use of the copyrighted content is not authorized.

14.   Recognizing that online service providers like Google are intermediaries and feasibly cannot (and should not) be required to make difficult determinations about the status of copyrights and user-posted content, the DMCA places the burden on copyright claimants asserting rights—who are better positioned to know the facts relating to copyright ownership and infringement—to submit notifications of claimed infringement that contain certain specified elements and to attest to compliance with those requirements. 17 U.S.C. § 512(c)(3)(A). In turn, the DMCA offers online service providers

certain protections from copyright liability for content generated or posted by third-party users if, in addition to meeting other conditions, the service providers expeditiously remove or disable access to content identified in compliant notifications. 17 U.S.C. § 512(c)(1). Indeed, an online service provider like Google risks losing protection under the DMCA's safe-harbor provisions if it receives, but does not expeditiously act upon, a notification claiming infringement that complies with the statutory requirements, discussed below.

15.     To be effective under the DMCA, a notification of copyright infringement (or "takedown request") must be submitted in writing by a person authorized to act on behalf of the owner of the rights that are allegedly being infringed, and it must contain certain specified elements. 17 U.S.C. § 512(c)(3)(A). The required elements of a DMCA-compliant takedown request are:

a.     A signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed (17 U.S.C. § 512(c)(3)(A)(i));

b.     Identification of the copyrighted work claimed to have been infringed (17 U.S.C. § 512(c)(3)(A)(ii));

c.     Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material (17 U.S.C. § 512(c)(3)(A)(iii));

d.     Information reasonably sufficient to permit the service provider to contact the complaining party (17 U.S.C. § 512(c)(3)(A)(iv));

e.     A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law (17 U.S.C. § 512(c)(3)(A)(v)); and

f.     A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed (17 U.S.C. § 512(c)(3)(A)(vi)).

16.     Neither the DMCA's notice-and-takedown provisions nor its conditions for safe-harbor protections require a service provider to proactively monitor its service or to affirmatively seek facts

indicating infringing activity. 17 U.S.C. § 512(m). Rather, the DMCA relies on the honesty and good faith of copyright claimants, requiring them to support their claims with a statement under penalty of perjury and relying on the accuracy of the information they submit.

17.     The DMCA also protects online service providers' reasonable expectations that they will not be burdened with fraudulent takedown requests. In particular, the DMCA provides a cause of action to any service provider that is injured by knowing, material misrepresentations in a takedown request:

> Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred . . . by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . .

17 U.S.C. § 512(f).

**Google's Procedures for Protecting Copyright Owners and Processing Takedown Requests**

18.     Google invests substantial resources so that website owners can report infringing content efficiently and easily. If Google receives a notice of claimed infringement it acts quickly to remove the challenged content. Google employs dedicated teams of software engineers, research scientists, program managers, and investigators in connection with its DMCA notice-and-takedown procedures and cooperates with rightsholders to identify bad actors abusing Google's products and services.

19.     In compliance with the DMCA's notice-and-takedown procedures, Google has developed two independent mechanisms for copyright owners to submit notifications of copyright infringement in Google Search results: (i) notifying Google's copyright agent in writing using dedicated physical or email addresses, which does not require the claimant to have or create a Google account; or (ii) submitting a web form (the "Copyright Webform") through Google's website.

20.     Those who wish to use Google's publicly available Copyright Webform must first create a Google account (a "Gmail account") or sign into an existing account. A user must expressly agree to Google's TOS and Gmail Program Policies[3] to create and use a Gmail account.

21.     The TOS requires, *inter alia*, that users "comply with applicable laws" and that they not "abuse…the services – for example, by accessing or using them in fraudulent or deceptive ways…"

---

[3] Google's Gmail Program Policies are published at https://www.google.com/gmail/about/policy/.

22.     The TOS also incorporates "service-specific additional terms and policies," including the Gmail Program Policies. The Gmail Program Policies expressly provide that users must not "create or use multiple accounts to abuse Google policies," must "respect copyright laws," and must not "use Gmail to promote, organize, or engage in unlawful activities."

23.     Google's Copyright Webform contains freeform text fields that require a user to provide first and last name, email address, country/region, identification of the copyrighted work, at least one URL where the copyrighted work can be viewed, and the URL(s) of the allegedly infringing material that the user is asking Google to remove. The Copyright Webform also requires the user to identify whether the user or someone else is the copyright holder and to read and affirm (by checking boxes) the following statements:

>       a.      "I have a good faith belief that use of the copyrighted materials described above as allegedly infringing is not authorized by the copyright owner, its agent, or the law;"

>       b.      "The information in this notification is accurate and I swear, under penalty of perjury, that I am the copyright owner or am authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;" and

>       c.      "I understand that a copy of each legal notice may be sent to the Lumen project (http://lumendatabase.org) for publication and annotation. I also understand that Lumen redacts personal contact information from notices before publication, but in many cases, will not redact my name."

Below the three statements, the Copyright Webform requires the user to date and sign the form by selecting the date and typing the user's name in a signature box, with the following notice: "By typing your full name above, you are providing us with your digital signature, which is as legally binding as your physical signature. Please note that your signature must exactly match the first and last names that you entered at the top of this web form in order for your submission to be successful."

24.     Google's Copyright Webform also provides the following notice above the section where the user is first required to enter the user's first and last name:

>       IMPORTANT: Misrepresentations made in your notice regarding whether material or activity is infringing may expose you to liability for damages (including costs and attorneys' fees). Courts have found that you must

consider copyright defenses, limitations or exceptions before sending a notice. In one case involving online content, a company paid more than $100,000 in costs and attorneys fees after targeting content protected by the U.S. fair use doctrine. Accordingly, if you are not sure whether material available online infringes your copyright, we suggest that you first contact an attorney.

25. Google reviews takedown requests related to Google Search results using a combination of human manual review and automation (*e.g.*, to detect which URLs are not listed by Google). Once Google has confirmed that a takedown request contains the elements required by the DMCA, if appropriate, Google expeditiously delists the URL(s) containing allegedly infringing content from Google Search results, both to comply with the DMCA and to protect the interests of legitimate rightsholders. This can result in the delisting of a significant portion or even the entire website of a third party from Google Search results unless and until that third party takes the appropriate steps to have its URLs reinstated.

26. As an online service provider that each year receives millions of takedown requests targeting more than 600 million URLs, Google often must rely—as the DMCA contemplates—on the accuracy of the statements submitted by copyright claimants.

**Defendants' Deliberate Deluge of Fraudulent Takedown Requests**

27. Defendants deliberately, systematically, and illegally exploited Google's systems and DMCA notice-and-takedown procedures to target their competitors' listings in Google Search.

28. Google has worked hard and invested substantial resources over decades to make Google Search the most useful and reliable search engine on the Internet. Approximately two billion people use Google Search every month, resulting in billions of searches per day and trillions per year.

29. Due to its reach and substantial goodwill engendered in the public, Google Search has become a trusted global hub for commerce. Among many other things, the consuming public uses Google Search to find, compare, and purchase a vast range of goods and services from third-party sellers. If a third-party seller's web page is removed from Google Search results, it can have a significant negative impact on the seller's business.

30. Google generates most of its revenue from Google Search by selling advertising that typically appears atop Google Search results ("Search Ads"). Third-party sellers that want to advertise

their products enter into contracts with Google to participate in its Ads program and have the opportunity to place bids for Search Ads to show their products and services on relevant Google Search results pages. Sellers often use Search Ads to attract customers and generate revenue for their businesses. Those Search Ads typically contain links to the relevant URLs where the sellers' products and services are available.

31.     Defendants recognized the impact that their competitors would experience if their web pages, which are located at URLs, were removed from Google Search results. So they created dozens of different Gmail accounts to submit fraudulent takedown requests targeting more than 117,000 URLs to date, apparently to harm their competitors. An investigation by Google has revealed at least 65 different Gmail accounts linked to the named Defendants, through which Defendants have used Google's Copyright Webform to submit these fraudulent takedown requests against third-party online retailers, particularly websites selling t-shirts. And these appear to be the tip of the iceberg—Google's ongoing investigation has identified likely fraudulent takedown requests, also linked to Defendants, targeting more than half a million additional third-party URLs.

32.     Google has traced Defendants' abusive and unlawful conduct identified so far to dozens of Gmail accounts created, owned, and/or controlled by Defendants Nguyen and Pham.

33.     Defendants' takedown requests investigated so far by Google are fraudulent for numerous reasons:

    a.     Defendants attempted to hide their identities by providing fake names in all the takedown requests.

    b.     At various times, Defendants falsely purported to represent large companies (*e.g.*, Amazon, Twitter, NBC News), sports teams (*e.g.*, Philadelphia Eagles, Los Angeles Lakers, San Diego Padres), prominent individuals (*e.g.*, Elon Musk, Taylor Swift, LeVar Burton, Kanye West), and famous bands (*e.g.*, Blink 182).

    c.     For instance, Defendants falsely claimed to represent Amazon and alleged infringement of a t-shirt with the text "In 2006 Beyonce Said To The Left, To The Left And My Political Compass Was Born" (https://bateesa.com/product/coe-shirtsthtgohard-in-2006-beyonce-said-to-the-left-to-the-left-hoodie/).

d.      In another instance, Defendants falsely claimed to represent Elon Musk, alleging infringement of a t-shirt with a logo with the text "Pharmacy Technician" (https://heavenshirt.com/product/pharmacy-week-certified-technician-tech-professional-pride-t-shirt/).

e.      In other cases, Defendants listed fake companies in their takedown requests. To give just one example, Defendants purported to submit Takedown Requests on behalf of a company called "MyFrogtees LLC" in connection with a shoddy website, www.myfrogtees.com, that appears to sell t-shirts in the United States. On information and belief, however, MyFrogtees LLC is not a legal entity in the United States, despite listing on its website a purported physical address in Albuquerque, New Mexico. The listed address is in fact a single-family home, and the owner at the address credibly claims to have no knowledge of "MyFrogtees" or the named Defendants.

f.      In many cases, Defendants provided plainly disingenuous information in the company name field on the Copyright Webform, such as "TESTTT" and "this is funny game."

g.      Where required to identify the allegedly infringed copyrighted works that Defendants claimed to own or represent, Defendants in some instances submitted irrelevant third-party URLs;[4] in other instances they listed images or designs for which they clearly did not hold or represent the copyright.[5]

h.      Defendants signed and submitted their thousands of fraudulent takedown requests containing false information under penalty of perjury.

---

[4] *See, e.g.*, https://twitter.com/sethweathers/status/1417808104947920896, https://twitter.com/thebeatles/, https://www.nbcstore.com/collections/law-order-svu, and https://books.google.com.vn/books?id=l10EAAAAMBAJ&pg=PA73.

[5] See, e.g., https://twitter.com/Suns/status/1594037150135177216, https://twitter.com/ManUtdMEN/status/1594075743180689409, https://www.marthastewart.com/shop/independently-published-pumpkin-is-my-favorite-season-halloween-blank-lined-journal-notebook-pf04a7a1958acac1f46a17b7af3557f4e.html, https://twitter.com/classicshirts/status/1594012832441536519, https://www.adlibris.com/se/bok/spaceland-9780765303677, and https://www.barnesandnoble.com/w/when-every-day-is-saturday-richard-e-grace/1013713784.

34.   For each of these thousands of fraudulent takedown requests that Defendants submitted, Defendants declared that they had a good faith belief that the third-party content they identified was infringing, and that use of such content by third parties was unlawful. Defendants also declared that the information contained in each takedown request using the Copyright Webform was accurate, and, under penalty of perjury, that Defendants were the owner, or agent of the owner, of the described materials and rights.

35.   In addition to "MyFrogtees LLC," Google investigated other purported companies with purported addresses in Oregon and New Mexico with which Defendants have claimed to be associated. None of those companies appears to exist, and the U.S. addresses listed for them are single-family residences or unrelated businesses whose owners or occupants credibly claim not to know anything about Defendants or their purported companies. On information and belief, Defendants are based in Vietnam and have no physical presence in the U.S. despite their representations to the contrary.

36.   Defendants knew that the content of each of their thousands of takedown requests was false, that they were not the owner or agent of the owner of the rights described in the takedown requests, and that the third-party content they identified did not infringe on any copyright that they owned or represented.

37.   Moreover, Defendants are not just aware that their scheme is abusive and unlawful— they are proud of it. On information and belief, Defendant Nguyen is associated with a Gmail account that posted a video describing the scheme on YouTube in November 2022 titled "2022 SEO 3 minutes to take top 1 google by Fake DMCA complaints." The video's description contains the following (with all typos in the original):

> 2022 SEO tips: 3 minutes to take top 1 google by Fake DMCA complaints
>
> How to tak top1 google?
>
> Black hat seo can do it. Make a fake DMCA for Compertier and you will get top 1 google in the 3 minutes, DMCA Takedown Notices please search it on google.

38.     Bad actors like Defendants use this tactic to attack and fraudulently suppress competitors' websites and products in Google Search results, making consumers more likely to buy the same or similar products from the bad actors or their affiliates. Such bad actors know that a fraudulent takedown request often has the same effect as a legitimate one; if a takedown request contains all the elements required under Section 512(c)(3)(A), it likely will trigger removal by Google.

39.     To date, Defendants' scheme has forced Google to investigate and respond to fraudulent takedown requests targeting more than 117,000 third-party website URLs, as well as takedown requests targeting more than half a million additional third-party URLs that are likely fraudulent based on preliminary investigation.

40.     Unfortunately, to ensure compliance with the DMCA and in reliance on the information submitted in Defendants' takedown requests, Google's system removed a significant number of third-party website URLs targeted by Defendants for a period of time before Google and/or the websites' owners figured out what was going on and took appropriate steps to reinstate the URLs.

41.     Those third-party sellers—many of whom are Google Search Ads customers—and Google were damaged by Defendants' unlawful and expressly prohibited conduct. In the most egregious case, from August to December 2022, Defendants submitted fraudulent takedown requests targeting more than 35,000 website URLs from a Google customer that spends tens of millions of dollars per year on Search Ads. Defendants' fraudulent takedown requests caused that Google customer's daily website traffic to drop significantly during the 2022 holiday season—the most critical time of the year for retailers—resulting in over $5 million in revenue losses for that customer (and its sellers), with a corresponding loss to Google of between $2 and $3 million, before Google was able to reinstate all the targeted URLs.

42.     Defendants' unlawful and expressly prohibited conduct additionally has damaged Google by forcing Google to expend significant resources to investigate and address Defendants' wrongdoing.

43.     Moreover, Defendants' conduct threatens irreparable harm to Google by undermining the trust that the public and customers place in Google, thereby tarnishing Google's brand and reputation.

**COUNT I:**
**MISREPRESENTATION OF COPYRIGHT INFRINGEMENT**
**(17 U.S.C. § 512(f))**

44.     Google repeats and realleges each and every allegation above as if fully set forth herein.

45.     Section 512(f) of the Copyright Act provides that "[a]ny person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred . . . by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing . . . ." 17 U.S.C. § 512(f).

46.     Defendants submitted fraudulent DMCA takedown requests to Google's designated Copyright Agent using Google's Copyright Webform, unlawfully seeking removal of more than 117,000 third-party website URLs and corresponding product listings from Google Search results based on knowingly false allegations of infringement. Defendants' takedown requests to Google falsely

represented that the targeted third-party URLs in Google Search results infringed on purported copyrights owned or represented by Defendants, when Defendants knew that they owned no such rights, represented no such rights, and that the targeted URLs did not infringe any such rights.

47.   Defendants knew that these representations were false. At the time they submitted the fraudulent takedown requests to Google, Defendants could not have reasonably believed that they held any copyright or other intellectual property interest in the works asserted. Defendants nonetheless submitted these false claims with the intent to induce Google's reliance and to have Google act upon them, consistent with the notice-and-takedown procedures set forth in the DMCA and Google's policies.

48.   In reliance on the misrepresentations in Defendants' takedown requests, and to act expeditiously to protect what it believed at the time to be legitimate rights, Google delisted the fraudulently targeted URLs from Google Search results, impacting more than 117,000 web pages belonging to third-party sellers.

49.   As a result of Defendants' fraudulent takedown requests, Google suffered economic harm from lost advertising revenue and business relations, in addition to expending significant resources to investigate and remedy Defendants' wrongdoing. Accordingly, Google seeks its attorneys' fees and damages, under 17 U.S.C. §512(f), in an amount to be determined at trial.

## COUNT II:
## BREACH OF CONTRACT

50.   Google repeats and realleges each and every allegation above as if fully set forth herein.

51.   In creating and using dozens of Gmail accounts, Defendants entered into valid and enforceable agreements with Google, namely the TOS and Gmail Program Policies.

52.   Google has performed all its obligations under the TOS and Gmail Program Policies.

53.   Defendants breached their contractual obligations to Google under the TOS and Google Program Policies by creating dozens of Gmail accounts that they used to carry out their fraudulent scheme to harm Google's third-party users.

54.   As a result of Defendants' breach of their contracts with Google, Google has suffered damages in an amount to be determined at trial.

**COUNT III:**
**INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**

55.    Google repeats and realleges each and every allegation above as if fully set forth herein.

56.    Google and third-party sellers who purchase Search Ads have valid contractual relationships under the Google Advertising Program Terms.[6]

57.    On information and belief, Defendants have knowledge of the valid contractual relationships between Google and the third-party sellers who buy Search Ads.

58.    Defendants knowingly and intentionally created and used dozens of Gmail accounts for the improper purpose of interfering with Google's legitimate contractual relationships with its Search Ads customers.

59.    Defendants' misuse of Gmail accounts to submit fraudulent takedown requests caused Google to remove Search Ads listings by third-party sellers from Google Search results. Those actions interfered with the contractual relationships and expectancy between Google and third-party sellers who bought Search Ads to place those listings.

60.    As a result of Defendants' intentional interference with Google's contractual relations with its third-party customers, Google suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Google respectfully requests:

A.    That the Court issue an order permanently enjoining Defendants, their officers, agents, representatives, servants, employees, successors, and assigns, and all others in active concert or participation with them, from:

       i.    submitting any takedown requests based on false assertions of rights of ownership to Google by any means;

      ii.    creating or attempting to create any Gmail accounts;

     iii.    using any Google products or services to promote any of Defendants' websites or products;

---

[6] https://payments.google.com/payments/apis-secure/u/0/get_legal_document?ldi=31373.

iv. using any Google products or services to harm or attempt to harm any third parties, including without limitation Google's Search Ads customers; and

v. assisting, aiding, or abetting any other person or entity in engaging or performing any of the activities described in subparagraphs (i) through (iv) above.

B.     That the Court enter judgment in Google's favor on all claims.

C.     That Defendants be required to pay all general, special, and actual damages that Google has sustained or will sustain as a consequence of Defendants' unlawful acts.

D.     That Defendants be required to pay the costs of this action and Google's reasonable attorneys' fees and other costs incurred in prosecuting this action.

E.     That the Court grant Google such other, further, and additional relief as the Court deems just and equitable.

## JURY TRIAL DEMAND

Google hereby requests a jury trial for all issues so triable in this action.

Dated: November 13, 2023                    Respectfully submitted,

LEX LUMINA PLLC

By: /s/ *Rhett O. Millsaps II*
     Rhett O. Millsaps II (SBN 348949)
     rhett@lex-lumina.com
     Mark A. Lemley (SBN 155830)
     mlemley@lex-lumina.com
     700 S. Flower Street, Suite 1000
     Los Angeles, CA  90017
     United States
     Telephone:  +1 213.600.6063
     Facsimile:  +1 646.906.8657

*Attorneys for Plaintiff Google LLC*